IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOAN CURTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 7310 |
| | ) | |
| RICHARD A. DEVINE, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

On December 30, 2005, plaintiff Joan Curtin ("Curtin") filed a one-count complaint

against defendant Richard A. Devine ("Defendant"), in his official capacity as State's Attorney

of Cook County, alleging that the Cook County State's Attorney's Office violated the Age

Discrimination in Employment Act, 29 U.S.C. § 621 *et seq* ("ADEA") in terminating Curtin's

employment on February 10, 2005. Defendant has filed a Motion for Summary Judgment, (Dkt.

No. 30), arguing that Curtin cannot support a *prima facie* case of discrimination. For the reasons

stated below, Defendant's Motion for Summary Judgment is denied.

LEGAL STANDARDS

1.     Summary Judgment

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling

1

on a motion for summary judgment, the court must view all evidence in the light most favorable to the non-moving party. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The court does not make credibility determinations or weigh conflicting evidence. *Abdullahi*, 423 F.3d at 773. However, summary judgment must be granted in favor of the moving party if there are no genuine issues as to any material fact, such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Furthermore, a party bearing the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. *Celotex*, 477 U.S. at 324. The evidence relied upon must be competent evidence of a type otherwise admissible at trial, including affidavits based upon personal knowledge. *Juarez v. Menard, Inc.*, 366 F.3d 479, 484 n.4 (7th Cir. 2004). A "mere scintilla of evidence" will not defeat a properly supported motion for summary judgment; rather, there must be evidence such that a reasonable factfinder could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Trial courts have discretion to strictly enforce compliance with Local Rule 56.1, which addresses proper summary judgment procedures. *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). Ultimately, however, "the district court need[ ] only to decide whether, based on the evidence in the record, a material dispute of fact exist[s] that require[s] trial." *Sound of Music Co. v. Minnesota Mining & Mfg. Co.*, No. 05-4109, 2007 WL 446029, at *2 (7th Cir. Feb. 13, 2007).

2.    Age Discrimination in Employment Act

The ADEA prohibits discharge of an employee because of her age. 28 U.S.C. §
623(a)(1). "To establish a claim under the ADEA, a plaintiff-employee must show that 'the
protected trait (under the ADEA, age) actually motivated the employer's decision'—that is, the
employee's protected trait must have 'actually played a role in [the employer's decision-making]
process and had a determinative influence on the outcome.'" *Hemsworth v. Quotesmith.com,
Inc.*, No. 06-1885, 2007 WL 416984 (7th Cir. Feb. 8, 2007) (quotations omitted).

Plaintiffs can demonstrate discrimination through either the direct or indirect method of
proof. The direct method of proof includes both "near-admissions by the employer that its
decisions were based on a proscribed criterion" and circumstantial evidence "which suggests
discrimination albeit through a longer chain of inferences." *Luks v. Baxter Healthcare Corp.*,
467 F.3d 1049, 1052 (7th Cir. 2006) (*citing Sylvester v. SOS Children's Villages Ill., Inc.*, 453
F.3d 900 (7th Cir. 2006)). "The distinction between direct and circumstantial evidence is vague .
. . but more important it is irrelevant to assessing the strength of a party's case." *Sylvester*, 453
F.3d at 903. "It is enough that the circumstances give rise to a reasonable and straightforward
inference that the employer has relied on a proscribed factor in taking action against the
employee." *Luks*, 467 F.3d at 1053.

The "indirect method" of proof "involves a subset of circumstantial evidence (including
the disparate treatment of similarly situated employees) that conforms to the prescription of
*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Luks*, 467 F.3d at 1052. To
establish a *prima facie* case of discrimination via the indirect method of proof, a plaintiff in
Curtin's position must demonstrate that (1) she is a member of a protected class; (2) she was

3

performing her job in accord with her employers' legitimate expectations; (3) she was subjected to an adverse employment action; and (4) similarly-situated employees outside of her protected class were treated more favorably by the employer. *Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 696 (7th Cir. 2006). The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* Finally, the burden shifts back to the plaintiff to attempt to show that the defendant's stated reason is pretextual. *Id.*

BACKGROUND

When reviewing Defendant's Motion for Summary Judgment, the court views all relevant facts in the light most favorable to Curtin, the non-moving party:

1. General Background

Curtin began her employment with the Cook County State's Attorney's Office in April, 1997, and worked as a receptionist on the fifth floor of the Daley Center from August 13, 2002 until her termination on February 10, 2005. As a receptionist, Curtin was supervised by Office Manager Ivette Cervantes ("Cervantes"). At all times during her employment as a receptionist, Curtin shared her duties with the two other receptionists: Dominga ("Chila") Otero-Costillo and Valle ("Val") Wheeler.

During the relevant time period, Curtin's supervisor (Cervantes) reported directly to Dennis Manzke, Chief of the Administrative Services Bureau for the Cook County State's Attorney's Office. As Chief of the Administrative Services Bureau, Manzke oversaw the entire support staff for the Cook County State's Attorney, of approximately 700-800 employees. The evidence in the record shows Manzke relied on reports from his office managers and personal managers in evaluating the performance of the support staff. Manzke stated at his deposition in

this case that he generally does not have time to conduct investigations into employment matters. (Manzke Dep. 30:18-31:7).

2.    Termination Decision

Manzke made the decision to terminate Curtin's employment based upon the recommendations of Cervantes and Trisha Brannigan, Director of Human Resources for the Cook County State's Attorney's Office, and Curtin was terminated on February 10, 2005 for inappropriate behavior and insubordination.[1]  Manzke testified at his deposition that he made this decision because "there's just been a history of problems and complaints and just one built on to the other, to the other, to the other, to the other."  (Manzke Dep. 62:1-3).  Manzke stated that he did not rely upon his own observations of Curtin's insubordination in making the decision to terminate her; however, he also noted that his numerous conversations with Curtin regarding her behavior contributed to his decision to terminate Curtin's employment.  (Manzke Dep. 72:14-19; 63:13-18; 76:17-79:24).  In responding to the question: "What it was, what factors that your supervisors brought to you that led you to the conclusion that the best thing would be to terminate?" Manzke stated that "It seemed like it was getting to be almost like a weekly occurrence to her.[2]  There was a Joan Curtin issue with people that she worked with."  (Manzke Dep. 63:7-12).  Manzke pointed to the written warnings Curtin had received from Cervantes as

_____

[1] The record does not include any evidence that abuse of sick time or poor performance evaluations formed the basis for Manzke's decision to terminate Curtin's employment.  (*See* Manzke Dep. 75:11-76:13; 35:17-19; 80:2-4; Brannigan Dep. 90:13-91:2).  Manzke gave conflicting testimony regarding whether a complaint about Curtin's interactions with co-workers in the libaray, where she perviously worked, or his subsequent decision to relocate Curtin to the receiptionist position in 2002 affected his later decision.  (Manzke Dep. 72:22-73:13; 74:3-16).

[2] It is not clear to the court whether "her" refers to Curtin or Cervantes.

5

evidence of Curtin's unacceptable conduct. (Manzke Dep. 74:7-75:9). During the time that Curtin was employed as a receptionist on the fifth floor, there is no evidence that Manzke received complaints regarding Curtin's conduct from anyone other than Cervantes or Brannigan.

Brannigan testified at her deposition that Curtin's discharge was due to her overall behavior, as well as her past verbal and written warnings. At her deposition, Brannigan did not recall ever being treated rudely by Curtin herself, however she did recall that "in my conversations with Ivette, her office manager, there was insubordination every single time that Ivette had spoken with Joan. Joan was consistently insubordinate with her supervisor." (Brannigan Dep. 59:7-10). Brannigan did not personally witness any insubordination on Curtin's part, and she did not know of anyone besides Cervantes who had. (Brannigan Dep. 59:20-23; 61:11-17).

Curtin's co-receptionist, Chila Otero-Costillo, testified that she had never seen Curtin do or say anything that she would consider out of line or unprofessional, other than speaking loudly on the phone once or twice. (Otero-Costillo Dep. 44:7-24). Curtin was 64-years-old at the time she was terminated. The woman who was hired as Curtin's replacement was 26-years-old. (Brannigan Dep. 77:1-78:2).

3.    Disciplinary Warnings

Over the approximately two-and-a-half years that Curtin served as a receptionist on the fifth floor of the Daley Center, she received four letters of discipline from Cervantes, documenting insubordinate behavior. (*See* Dkt. No. 32, Exhibits G, M, N, and S).

Curtin does not disagree that she received a five-day suspension on July 22, 2003 for allegedly pointing a finger at Cervantes and stating, "Fuck you, you're being a racist." Curtin

does, however, deny Cervantes' version of the events.[3]  In her deposition testimony, Curtin denies that she said "fuck you" to Cervantes, or that she called her a racist.  (Curtin Dep. 92:1-93:3).  In a draft letter prepared by Curtin to be sent to Civil Actions Bureau Chief Patrick Driscoll, Curtin wrote, "As I was facing the door, I said 'That is a fucking lie' and I left the room."  (Dkt. No. 32, Ex. H).  Cervantes and Curtin agree that there were no other witnesses to this exchange.  The court finds support in the record for Curtin's argument that Cervantes' version of events, as stated in the disciplinary notice, is disputed.

Curtin does not dispute receiving a "verbal written warning" for allegedly asking caller Claudette Giles, "What happened to you when you got out of bed this morning?" and "How quickly do you want me to do it?," when Giles called the receptionist desk on August 6, 2004.  Although Curtin admits taking a phone call from Giles on that day, she denies using rude or unprofessional language with Giles.  (Curtin Dep. 111:14-18; 114:10-115:18).  Curtin notes that Giles never named the receptionist who treated her rudely, and that it was Cervantes who determined that the receptionist must have been Curtin.  (Giles Aff. ¶¶ 6-8; Cervantes Dep. 65:6-16).  In her deposition testimony, Cervantes described the process by which she identified Curtin as the rude receptionist.  (Cervantes Dep. 66:2-67:11; 130:17-131:9) ("she [Curtin] stated facts that only she could have known if she received the phone call").  Once again, there appears to be evidence in the record of a disputed question of fact as to whether Curtin treated Giles

---

[3] Defendant asks the court to disregard Curtin's responses to certain of Defendant's Local Rule 56.1 Statement of Material Facts, because Curtin improperly asserted new facts in her 56.1(b)(3)(B) response, rather than setting them forth in a separate 56.1(b)(3)(C) statement of additional facts.  While the court admonishes Curtin for her failure to follow correct procedures, the court believes it would be inappropriate to disregard a genuinely disputed question of material fact, brought to its attention through Curtin's citation to the record.

unprofessionally, as reported by Cervantes.

On the other hand, Curtin does not dispute Cervantes' version of a December 23, 2004 conversation, wherein Curtin told Cervantes that it was not fair that she was forced to stay late when it was not her turn to do so. Although Curtin argues that discipline was unwarranted, because she did stay late to cover the receptionist desk during the holiday, the court finds no dispute as to Cervantes' version of events, as documented in the "verbal warning" of December 23, 2004.

Finally, the record indicates some disagreement regarding Curtin's alleged handling of a phone call from Towana Harris ("Harris") on January 26, 2005. In her deposition testimony, Curtin denies taking any phone call from Harris on that day, and denies calling Harris a "bitch," as set forth in Cervantes' "written warning" of January 28, 2005. (Curtin Dep. 122:10-17; 123:18-124:15). Although, in her deposition testimony, Curtin also denies calling Harris a "witch," the draft letter to Patrick Driscoll states that "I had explained to Ivette what had happened during the phone call, that if anything I called her witch thinking the phone had been transferred." (Dkt. No. 32, Ex. H ¶ 11(f)). The affidavit of Ed Brooks, who was present for the conversation between Curtin and Cervantes, supports the "witch" version of events, as does Cervantes' deposition testimony. (Brooks Aff. ¶ 4; Cervantes Dep. 123:12-123:2). Also, in Curtin's answer to a specific interrogatory question (the precise nature of which remains unclear from the record), Curtin appears to have acknowledged speaking with Harris on the day in question. (Dkt. No. 32, Ex. P).

Although Cervantes' written warning states that Harris "heard the receptionist caller [sic] her a 'bitch,'" and may have overstated the case against Curtin, Manzke testified that he

personally spoke to Curtin about the incident, and that Curtin told him she called Harris a "witch." (Manzke Dep. 70:4-14). Manzke stated that this incident was not, in itself, a terminable offense, but that it contributed to his decision to terminate Curtin's employment with the Cook County State's Attorney's Office. (Manzke Dep. 70:21-23; 81:11-19).

4.     Evidence of Age-Related Bias

Defendant does not dispute Curtin's testimony that, during meetings in 2003 or 2004, Cervantes asked Curtin "Don't you think you're getting older and the job on information telephones is too stressful, you get cranky?" (Curtin Dep. 258:12-260:6). Curtin also testified that, for three years in a row, Cervantes told her that she was too old to participate in the fire drills. (Curtin Dep. 274:14-21) (recalling Cervantes as saying "You're too old. You'll be glad you could just get yourself out.").

Brian Sanchez ("Sanchez"), who visited the State's Attorney's Office on a daily basis in his position as a law clerk for the Cook County Public Administrator's Office, testified in his deposition that he overheard Cervantes (and others) disparaging Curtin due to her age. Sanchez, a fluent Spanish-speaker, testified that these conversations often were conducted in Spanish, while in the presence of Curtin.

To begin with, in February or March of 2004, Sanchez testified that he overheard Cervantes, Chila Otero-Costillo, Val Wheeler, and a security guard discussing the fact that Curtin was "slow" (in English) and laughing. (Sanchez Dep. 48:1-24). In November or December 2004, Sanchez overheard Cervantes remark "it must be her age," to which Otero-Costillo agreed "está vieja" (Spanish for "she is old"). (Sanchez Dep. 18:12-21; 32:18-33:24). In January, 2005, Sanchez heard Cervantes remark that Curtin was "a little bit off."

Sanchez heard Otero-Costillo make the same remark in January and February, 2005. (Sanchez Dep. 18:5-11; 25:4-15). Finally, in response to the question, "Did you ever hear Ivette make a comment 'I want to fire Joan because she's too old?,'" Sanchez waivered on the meaning of the term "desarser" (he testified that he had heard Cervantes say "me quiero desarser de ella"), but he eventually translated the term loosely as "I want to 'get rid of' (or 'eliminate') her." (Sanchez Dep. 28:10-30:5). Sanchez testified that Cervantes made this remark to Otero-Costillo, Wheeler, and a security guard in late 2004. (Sanchez Dep. 30:6-9).

Otero-Costillo testified that she never talked about Joan in Spanish in a derisive way. (Otero-Costillo Dep. 23:11-13).

<u>ANALYSIS</u>

As discussed above, the "direct method" of proof includes both direct evidence of discrimination (near-admissions) and circumstantial evidence (relying upon a longer chain of inferences). The distinction between these two types of evidence is oftentimes blurry and largely irrelevant. *Sylvester*, 453 F.3d at 903.

In this case, it is undisputed that Manzke made the final decision to terminate Curtin's employment. Furthermore, there is no direct or circumstantial evidence in the record to indicate that Manzke improperly considered Curtin's age in making his decision.

On the other hand, Curtin has set forth at least some evidence that Cervantes was prejudiced against Curtin because of Curtin's age. Cervantes specifically observed to Curtin that she (Curtin) was "getting old" and was "too old." Furthermore, Cervantes' comments to others that Curtin was "a little bit off" and "it must be her age" roughly coincided with Cervantes' statement that she wanted to "get rid of" or "eliminate" Curtin, and Curtin was discharged (on

Cervantes' recommendation) shortly thereafter. As the Seventh Circuit has stated, "To praise the young may be impliedly to depreciate the old; but to depreciate the old explicitly is to replace implication with asseveration." *Shager v. Upjohn Co.*, 913 F.2d 398, 402-03 (7th Cir. 1990).

The evidentiary record demonstrates that Cervantes may have held an age-related bias against Curtin as early as 2003, throughout 2004, and into the beginning of 2005. However, the pertinent question is whether Cervantes' alleged bias tainted Manzke's decision to terminate Curtin's employment. *Shager*, 913 F.2d at 405; *see also Lust v. Sealy, Inc.*, 383 F.3d 580, 584-85 (7th Cir. 2004). Curtin need not prove that Manzke knew of Cervantes' age-bias, *Byrd v. Illinois Dept. of Public Health*, 423 F.3d 696, 709 (7th Cir. 2005), but it is Curtin's burden to prove that Manzke "rubber-stamp[ed] a recommendation tainted with illegal bias." *Id.* at 708. In other words, if Manzke's decision to terminate Curtin was made for reasons unrelated to and independent from Cervantes' allegedly tainted reports, Curtin will not be able to support her claim of age discrimination. *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997) ("[W]hen the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissible basis, the bias of the subordinate is not relevant.").

The evidence before the court demonstrates that Cervantes' reports of Curtin's conduct were a driving force behind the decision to terminate Curtin's employment. *See Sun v. Board of Trustees of Univ. of Ill.*, 473 F.3d 799, 813 (7th Cir. 2007) ("the statements of a person who lacks the final decision-making authority may be probative of intentional discrimination if that individual exercised a significant degree of influence over the contested decision"). Manzke testified that he relied upon the recommendations of both Cervantes and Brannigan in making

the decision to terminate Curtin.  Although Manzke testified that he had various conversations with Curtin regarding her conduct, neither he nor Brannigan personally witnessed Curtin's allegedly inappropriate and insubordinate behavior.  Manzke testified that Curtin herself told him that she called Harris a "witch," but he also testified that this was only one factor that he considered in terminating Curtin, and that this incident by itself would not have warranted termination.  Brannigan testified that her opinion derived from Cervantes' reports of Curtin's behavior, and not personal knowledge.

The court finds that the record before it demonstrates that a disputed question of fact exists whether Cervantes was accurately reporting Curtin's disciplinary problems to both Brannigan and Manzke, during a time period when Cervantes may have been harboring an age-related bias against Curtin.  With both managers relying largely (or entirely, in Brannigan's case) upon Cervantes' reports, the veracity of these reports and their disputed nature makes this case inappropriate for disposition by summary judgment.  Because the court finds that Curtin has adequately supported her argument under the direct method of proof, the court need not address whether the indirect method applies to these facts, as well.

<u>CONCLUSION</u>

For the reasons stated above, Defendant's Motion for Summary Judgment is denied.  All future dates remain set as scheduled in the court's order of April 27, 2006.  (Dkt. No. 10).  The parties are strongly encouraged to discuss settlement and to arrange a settlement conference with Magistrate Judge Schenkier at a time that is compatible to counsel's and Judge Schenkier's schedule during the month of March, 2007.

ENTER:

James F. Holderman

JAMES F. HOLDERMAN
Chief Judge, U.S. District Court

Date: March 1, 2007